# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

| | |
|---|---|
| IVAN M. SUZMAN ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Docket No. 2:05-CV-192-GZS |
| ) | |
| ADOLPH CRISP, ) | |
| *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## FINDINGS OF FACT & CONCLUSIONS OF LAW

This matter came before the Court for a bench trial, which was held on April 30, 2007. Plaintiff Ivan Suzman asserted claims for fraud and breach of contract. At the close of the trial, the Court ordered the parties to submit proposed findings of fact and conclusions of law. The parties filed their proposals on May 15, 2007 (Docket #s 125 & 126).

In accordance with Federal Rule of Civil Procedure 52(a) and having reviewed the parties' post-trial submissions as well as the entire record,[1] the Court now makes the following findings of fact and conclusions of law.

---

[1] The parties did not arrange for the production of a complete trial transcript. Rather, the parties apparently drafted their proposed findings of fact relying solely on memory and the limited exhibits. During the bench trial, Defendants were prohibited from introducing exhibits or calling witnesses beyond those identified by Plaintiff because Defendants Adolph Crisp and Rayella Booton-Brown failed to appear for the final pretrial conference on February 8, 2007 or file any pleading beyond their answers on October 2, 2006. (See Report on Final Pretrial Conference and Order (Docket # 90) at 2, 5-6.) While it may be tempting to follow the parties' lead and simply assume that the Court's recollection of the testimony is sufficiently accurate, the Court in fact ordered and then reviewed the complete trial transcript after it was received on May 24, 2007. The Court's need to request the complete record after the parties had completed their post-trial submissions caused additional delay.

## I.  FINDINGS OF FACT

Plaintiff and Defendant Rayella Booton-Brown met over twenty years ago in Maine. Plaintiff has Parkinson's disease and requires extensive care. On February 5, 2005, Plaintiff contacted Booton-Brown and expressed concern about the care he was receiving and requested that she come to Maine. Plaintiff bought Booton-Brown a plane ticket, and the next day, she flew from Tennessee, where her son was living, to Maine.

When Booton-Brown arrived in Maine, she took over Plaintiff's care. Within a short period of time, Booton-Brown decided to return to Oklahoma, where she had lived previously. She represented that she would care for Plaintiff if he returned with her. At the time, Plaintiff was living in Portland, Maine in a house that he owned free of a mortgage. Plaintiff and Booton-Brown agreed that Plaintiff would sell his home and move to Oklahoma with Booton-Brown. Once in Oklahoma, Plaintiff and Booton-Brown planned on renting a house owned by Defendant Adolph Crisp.[2]

In February, 2005, Crisp owned a home at 2433 North Cheyenne Ave., Tulsa, Oklahoma ("N. Cheyenne residence") that he was renting for $700 per month. At that time, Crisp was renting the N. Cheyenne residence to a long-time tenant who would not willingly vacate the residence. Plaintiff and Defendants discussed the possibility that Plaintiff would rent the residence, with the option to buy. No specific terms regarding the sale of the real property, the timeline for the sale or the price were agreed upon by the parties.

In March, 2005, Crisp flew to Maine to help Plaintiff and Booton-Brown prepare for the move to Oklahoma. On March 11, 2005, while Crisp was in Maine, Plaintiff changed his will to name Booton-Brown and her children as the beneficiaries. On the

---

[2] Booton-Brown and Crisp met before the events that gave rise to this case.

same day, Plaintiff changed his Power of Attorney for Health Care and Durable Power of Attorney to name Booton-Brown and Crisp his agents to make health care decisions and attorney-in-fact. Shortly before traveling to Oklahoma, however, Plaintiff returned to the attorney's office. He restored his Power of Attorney for Health Care and Durable Power of Attorney to designate his father and two brothers as his agents. He also invalidated the will that he created on March 11 by writing "invalid" across the face of the document. (Pl. Ex. 14.)

On April 29, 2005, Plaintiff sold his residence in Portland for approximately $210,000.[3] Later that same day, Plaintiff, Booton-Brown and Crisp flew to Oklahoma. Upon arrival, Plaintiff and Booton-Brown did not go to the N. Cheyenne residence. Instead, the parties went to Crisp's residence at North Denver Place in Tulsa, Oklahoma.

Plaintiff knew before he sold his house and left Maine that the N. Cheyenne residence was occupied by a tenant and would therefore be unavailable upon arrival in Oklahoma.[4] While Crisp was in Maine, he used Plaintiff's phone to contact the tenant. After the phone calls, Crisp would update Plaintiff regarding the tenant and that she was

---

[3] Plaintiff claims that the house was sold for $23,000 to $30,000 less than its value.

[4] Plaintiff asserts that he had no knowledge that the residence at N. Cheyenne Ave. would be unavailable prior to arriving in Oklahoma. In furtherance of this claim, Plaintiff testified at trial that he had never heard of Crisp's North Denver Place address prior to arriving in Oklahoma. Specifically, Plaintiff testified:

> [Plaintiff]: When I got out of the plane in Tulsa, airport, Your Honor, it was only then when we were standing at the curb waiting for the taxi that [Booton-Brown and Crisp] started to fight and they said where we were going and we were not going to see North Cheyenne . . . .
>
> The Court: Had you ever heard of the North Denver Place before that?
>
> [Plaintiff]: I did not know except when we got into the cab.

(Tr. (Docket # 127) at 100-01.) Plaintiff's testimony is clearly contradicted by the evidence introduced at trial. For example, the day before flying to Oklahoma, Plaintiff obtained health certificates for his two cats to travel. The "destination address" for the cats is listed as 2747 North Denver Place, Tulsa, Oklahoma 74106. (Pl. Ex. 19.) Accordingly, the Court finds Plaintiff's testimony stating that he had never heard of North Denver Place simply untrue.

still occupying the residence. Thus, Plaintiff was informed that Crisp would have to evict the tenant before Plaintiff and Booton-Brown could move into the N. Cheyenne residence.[5]

The first night in Crisp's residence, Plaintiff slept in a bedroom on the fourth floor. After the first night, Plaintiff requested that he be moved to a lower floor near a bathroom. Crisp and Booton-Brown complied with the request and resettled Plaintiff to the dining room, across from a bathroom.[6]

Shortly after arriving in Oklahoma, Plaintiff tendered a check for $8,400 for twelve months rent for Booton-Brown to occupy the N. Cheyenne residence.[7] Crisp then provided Plaintiff a handwritten receipt, which provided that the $8,400 was for twelve months rent "for benefit and consideration of Mrs[.] Rayella Booton Brown." (Pl. Ex. 3.) Booton-Brown lived in the N. Cheyenne residence for twelve months after the tenant vacated the residence with the rent paid by Plaintiff.

After five days and on May 6, 2005, Plaintiff chose to travel to Florida, where his elderly father resided. Plaintiff was hospitalized and stayed in a nursing home in Florida for a short period. He remained in Florida until May 22, 2005 when he returned to Maine. Upon his return to Maine, Plaintiff bought a new residence.

---

[5] Even if the residence had been vacant, Plaintiff and Booton-Brown would have had no furniture. They would have had to travel to Tennessee to retrieve Booton-Brown's belongings before they could occupy the residence.

[6] During this short time period, Plaintiff claims that he was mistreated. The Court, however, does not find this testimony credible. By way of example, Plaintiff originally claimed in his pro se complaint that he was "forced to sleep on the floor, in the kitchen, on the third floor, on a steel coil box spring . . . ." (Compl. (Docket # 1) at 3.) During opening statements, Plaintiff's counsel continued to claim that Plaintiff slept on the kitchen floor of the Crisp household. (Tr. (Docket # 127) at 8.) At trial, however, Plaintiff stated that he slept on the floor of the dining room. (Id. at 25.) In addition, Plaintiff testified at different points during the trial that he did complain (Id.), that he was not sure if he complained (Id. at 86.) and that "[i]t's what I had and I accepted that." (Id.)

[7] Plaintiff claims that Defendants demanded that he pay the entire year's rent ($8,400) or he would be thrown out of Crisp's home. The record before the Court does not support Plaintiff's version of events.

**II.  CONCLUSIONS OF LAW**

The Court must now determine whether Plaintiff has proven his case for fraud and breach of contract.

**1.  Fraud**

Under Maine law, in order to prove fraud, the plaintiff must establish by clear and convincing evidence that the Defendants "(1) ma[de] a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance upon it, and (5) the plaintiff justifiably relie[d] upon the representation as true and act[ed] upon it to his damage." Jourdain v. Dineen, 527 A.2d 1304, 1307 (Me. 1987) (quoting Letellier v. Small, 400 A.2d 371, 376 (Me. 1979)). In addition, "pecuniary loss is an essential element of a fraud action and [] damages for emotional or mental pain and suffering are not recoverable." Id.

After hearing the witnesses' testimony, and after due consideration of the evidence in the record, the Court finds that Plaintiff has failed to prove his claim for fraud. The gist of Plaintiff's claim is that Defendants falsely represented that the residence on N. Cheyenne Avenue would be available and ready for new tenants when the parties arrived in Oklahoma.[8] Plaintiff claims that he relied on these representations in selling his home at an allegedly distressed price, changing his will and powers of attorney and moving to Oklahoma. Plaintiff, however, failed to show that either Defendant made a false representation regarding the availability of the residence. The evidence establishes that Defendants informed Plaintiff that a tenant remained in the N.

---

[8] Notably, in Plaintiff's proposed conclusions of law, Plaintiff fails to identify the precise representation on which he relied.

Cheyenne residence and it would therefore not be available upon their arrival in Oklahoma. Thus, Plaintiff knew the residence was unavailable, that the tenant would have to be evicted and that alternate living arrangements had been made for the interim period. All that Plaintiff proved at trial was that there was a plan to move into the N. Cheyenne residence when it became available.[9]

In short, the Court finds that Plaintiff has failed to prove that either Defendant made a false representation of a material fact with knowledge of its falsity or in reckless disregard thereof by clear and convincing evidence. As a result, Plaintiff is not entitled to damages related to his claim for fraud.

**2.     Breach of Contract**

A valid contract requires an offer, acceptance of that offer, a meeting of the minds and consideration. See Forrest Assocs. v. Passamaquoddy Tribe, 760 A.2d 1041, 1044-45 (Me. 2000); Zamore v. Whitten, 395 A.2d 435, 439-40 (Me. 1978) (overruled on other grounds). Furthermore, "the parties [must] mutually assent 'to be bound by all [of the contract's] material terms; the assent must be manifested in the contract, either expressly or impliedly; and the contract must be sufficiently definite to enable the court to determine its exact meaning and fix exactly the legal liabilities of the parties.'" Forrest Assocs., 760 A.2d at 1044 (Me. 2000) (quoting VanVoorhees v. Dodge, 679 A.2d 1077, 1080 (Me. 1996)). In Forrest Associates v. Passamaquoddy Tribe, the Law Court found that a contract did not exist where a plan was presented and discussed in detail among the parties, and at the end of the meeting the Passamaquoddy Tribe agreed to continue to work towards planning the project. Id. at 1044-45. The court found that the

---

[9] The series of events at issue in this case is odd, and it is clear that the end result was not what Plaintiff desired. Nonetheless, Plaintiff has failed to prove the requisite legal elements for fraud.

-6-

Passamaquoddy Tribe did not intend to be bound and all that existed was an unenforceable agreement to work towards an agreement. Id. at 1045.

Plaintiff claims that a valid contract existed that "Suzman would sell his house in Maine and move to Oklahoma, and Defendants would provide a house in Oklahoma that Suzman could rent for $700 per month, with an option to buy, and would provide medical care to Suzman."[10] (Pl.'s Proposed Findings of Fact (Docket # 125) at 5.) After hearing the witnesses' testimony and consideration of the evidence in the record, the Court finds that Plaintiff has failed to prove his breach of contract claim. As in Forrest Associates v. Passamaquoddy Tribe, Plaintiff failed to show that there was a sufficient meeting of the minds and that Defendants intended to be bound to a contract. See 760 A.2d at 1044-45.

Rather, the evidence supports that Plaintiff and Defendants agreed that given Plaintiff's concern about his care, the best course was for Plaintiff to sell his home in Portland, Maine and move to Tulsa, Oklahoma. With definite and material terms not yet determined, the parties agreed to work towards an agreement regarding the N. Cheyenne residence with knowledge that the residence was unavailable and an eviction was required. This unenforceable plan to work towards a future agreement lacked the requisite mutual assent to definite and material terms for a valid contract. See id. In addition, Plaintiff abandoned any plan when he left Oklahoma and traveled to Florida. In short, Plaintiff failed to prove the requisite elements of a contract and is, therefore, not entitled to a finding of liability on his breach of contract claim.

---

[10] Although Plaintiff claims in his Proposed Findings of Fact and Conclusions of Law that the asserted contract included his medical care, Plaintiff, through his counsel, stated at trial that the medical care was not part of the contract claim. (Tr. (Docket # 127) at 131.)

-8-

### III.   CONCLUSION

In light of the findings of fact and conclusions of law, the Court ORDERS that Judgment on behalf of Defendants be entered.

**SO ORDERED.**

/s/ George Z. Singal
Chief United States District Judge

Dated at Portland, Maine, this 31st day of May, 2007.